IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DARRYL R. DUNCAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 14–cv–1167–MJR–SCW |
| | ) |
| THOMAS SPILLER, | ) |
| EDWARDS, | ) |
| CHRISTINE BROWN, | ) |
| | ) |
| Defendants. | ) |

# REPORT AND RECOMMENDATION

**WILLIAMS, Magistrate Judge:**

Pursuant to 42 U.S.C. § 1983, *pro se* Plaintiff Darryl Duncan has sued multiple defendants on multiple claims. (Doc. 1). After threshold review, the Court found that Plaintiff had stated an Eighth Amendment claim regarding being denied treatment and pain medication for the injuries he sustained in August and September, and being denied medication for hypertension, gout, and asthma. (Doc. 5, p. 7). The threshold order also found that Plaintiff's claims of deliberate indifference to serious medical needs involved a real and proximate threat of serious physical injury, and awarded in forma pauperis (IFP) status despite Plaintiff's history as a three-striker. (Doc. 5, p. 6). On September 1, 2015, Defendants filed a motion seeking to revoke Plaintiff's IFP status. (Doc. 104). Pursuant to 28 U.S.C. 636(b)(1)(B) the undersigned held an evidentiary hearing on Defendants' motion on October 7, 2015. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's IFP status be revoked and that Plaintiff be ordered to pay the full filing fee within a reasonable amount of time.

1

## Procedural Background

Plaintiff filed his Complaint on October 28, 2014. (Doc. 1). Contemporaneously, Plaintiff also filed a Motion for Leave to Proceed IFP. (Doc. 2). On October 30, 2014, the Court ordered Plaintiff to submit a trust fund statement so that it could determine whether Plaintiff was entitled to proceed without prepaying fees and costs. (Doc. 4). On November 3, 2014, the Court screened the case pursuant to § 1915A, and took up Plaintiff's IFP motion at that time. (Doc. 5). The Court noted that Plaintiff has had at least three cases dismissed as frivolous or for failure to state a claim upon which relief may be granted: *Duncan v. Walker*, No. 08-cv-315-JPG (S.D. Ill. dismissed Mar. 11, 2009); *Duncan v. Quinn*, No. 10-cv-3124-HAB (C.D. Ill. dismissed June 7, 2010); and *Duncan v. Quinn*, No. 14-cv-604-JPG (S.D. Ill. dismissed June 4, 2010). (Doc. 5). Plaintiff could therefore not proceed in forma pauperis unless he showed that he is in imminent danger. The Court found that Plaintiff's deliberate indifference to serious medical needs claims met that hurdle, and accordingly ordered service on Defendants. (Doc. 5). Waivers were sent to the Defendants on November 3, 2015, (Doc. 6-8) and they filed an Answer on February 17, 2015. (Doc. 26). None of the Defendants filed a response to Plaintiff's Motion for IFP status, and none of them had been served with the Complaint at that time.

Plaintiff filed numerous motions seeking injunctive relief in this case, and the undersigned held a hearing on them on March 12, 2015. (Doc. 41). During the hearing, the Court directed Defendants to provide Plaintiff's medical records, which they did, along with Plaintiff's blister pack sheets. (Doc. 43) (Doc. 44) (Doc. 97). The undersigned then prepared a Report and Recommendation which considered Plaintiff's testimony about his medical issues, Plaintiff's medical records, and the blister pack sheets. (Doc. 58). Ultimately, Plaintiff was released on parole, making his requests for injunctive relief, and the relevant Report and Recommendation moot. (Doc. 77).

Plaintiff was subsequently re-incarcerated on June 30, 2015 at Dixon Correctional Center. (Doc. 81).

On September 1, 2015, Defendants filed the present Motion to Revoke Plaintiff's in forma pauperis status. (Doc. 104). Plaintiff filed a Response on September 15, 2015. (Doc. 110). The Court held a hearing on this Motion on October 7, 2015. (Doc. 113). Both sides stated that they intended to rely primarily on the evidence presented in support of or opposing Plaintiff's requests for injunctive relief. Plaintiff was granted leave to file a supplemental response to the IFP motion in order to submit two reports that he claims are relevant. (Doc. 113). Plaintiff filed his supplement on October 14, 2015. (Doc. 115). It includes a Dixon Correctional Center Report prepared by the medical investigation team in February 2014 (Doc. 115, p. 2) and the Final Report of the Court Appointed Expert in Lippert v. Godinez prepared by the same medical investigative team. (Doc. 115, p. 68). As none of the medical care that Plaintiff receives at Dixon Correctional Center is relevant here, and because the reports do not address care received by Plaintiff specifically, the undersigned did not consider the reports.

**Factual Background**

Although many of Plaintiff's medical records are in the record or have been submitted to the Court, the undersigned limits the below discussion to medical records that are relevant to the events at issue here. The medical records presented at the prior hearing on Plaintiff's request for injunctive and previously submitted by Plaintiff (Doc. 22) show that Plaintiff transferred to Lawrence and underwent health care screening on November 15, 2013. His blood pressure on that date was listed as 169/96 when taken the first time and 152/90 when taken the second. The records reflect that Plaintiff was taking Lisinopril, allopurinol for his gout, naproxen, Tylenol, and Zantec. The doctor prescribed allopurinol, and Norvasc, among other drugs.

3

Plaintiff underwent an intake interview at Pickneyville Correctional Center on July 7, 2014. (Doc. 22-1, p. 37). He reported no complaints at that time, and Dr. Shah prescribed Prilosec, Allopurinol, ASA, Norvasc, Naproxen, and Xopenex. (Doc. 22-1, p. 37).

On July 29, 2014, Plaintiff was evaluated for non-specific discomfort after complaining of throbbing, constant, severe pain in his feet and back. (Doc. 22-1, p. 41). His blood pressure on that date was 110/80. (Doc. 22-1, p. 41). Plaintiff was given acetaminophen to take as needed and referred to the doctor. (Doc. 22-1, p. 41). Plaintiff was then seen by the doctor on August 1, 2014, and although that note is difficult to make out, it appears that Plaintiff received a low bunk, low gallery permit, and Tylenol. (Doc. 22-1, p. 42).

Plaintiff refused sick call on August 5, 2014, although a subsequent note indicates that Plaintiff was seen for a bump on his baby toe on that date. (Doc. 22-1, p. 43). The lump is described as a firm area the size of a dime with no open areas, redness, or drainage. (Doc. 22-1, p. 43). There is a largely illegible note from September 2, 2014, which indicates that Plaintiff underwent an examination. (Doc. 22-1, p. 44). In fact, there are three separate notes from that date, suggesting that Plaintiff was seen by multiple health care staff. (Doc. 22-1, p. 44-46). His blood pressure was 110/72, and Tylenol was discontinued at that time. (Doc. 22-1, p. 44, 46). Plaintiff was also given a pneumovax injection on that date. (Doc. 22-1, p. 45). The nurse note indicates that Plaintiff was complaining of pain and a small knot in his left wrist, and that he wanted Naprosyn, not Tylenol. (Doc. 22-1, p. 46). Plaintiff reported that he had not had this pain before, and his pain was listed as a 5 on a scale of 1-10. (Doc. 22-1, p. 46).

On September 6, 2014, Plaintiff again returned to the health care unit complaining that he had been prescribed Tylenol and not Naprosyn, and that his wrist continued to hurt. (Doc. 22-1, p. 47). Plaintiff described his pain as a 3 on a 1 to 10 scale. (Doc. 22-1, p. 47). The nurse referred

Plaintiff to the doctor. (Doc. 22-1, p. 47). Plaintiff's blood pressure is listed as 124/80. (Doc. 22-1, p. 47).

Plaintiff saw the optometrist on September 10, 2014. (Doc. 22-1, p. 48). He then refused nurse sick call on September 12, 2014. (Doc. 22-1, p. 48). Plaintiff saw the nurse again for his wrist pain on September 19, 2014. (Doc. 22-1, p. 50). The nurse gave him acetaminophen and noted that he was scheduled for lab work regarding his wrist. (Doc. 22-1, p. 50). On that day Plaintiff complained that his wrist still hurts, rated his pain as an 8, and noted that the swelling had gone down. (Doc. 22-1, p. 50). The nurse noted no swelling, bruising, or obvious signs of discomfort, but that Plaintiff reported pain with flexion in his left wrist. (Doc. 22-1, p. 50). On this visit, Plaintiff's blood pressure was 120/74. (Doc. 22-1, p. 50). Plaintiff reported that he had not experienced pain in his wrist before "this situation" but that he had been experiencing pain for a month. (Doc. 22-1, p. 50).

Plaintiff saw the doctor on September 23, 2014; he was then scheduled for a follow-up visit. (Doc. 22-1, p. 51). Plaintiff's blood pressure on that visit was 138/60. (Doc. 22-1, p. 51).

On September 29, 2014 Plaintiff was seen in healthcare for an incident where he allegedly got dizzy and fell. (Doc. 22-1, p. 52-54). Plaintiff testified that he got dizzy and fell at the hearing on March 12. The guard reported to the nurse the Plaintiff had been walking to 4 House when he sat down on the sidewalk and refused to go any further. (Doc. 22-1, p. 52-54). He complained of dizziness for the first time upon reporting to health care. (Doc. 22-1, p. 52-54). He also stated that he hit his head and complained of back and leg pain when the health care staff attempted to assist him to seated. (Doc. 22-1, p. 52-54). No redness, abrasions, or swelling was noted on Plaintiff's head or anywhere else. (Doc. 22-1, p. 52-55). Plaintiff's blood pressure was 126/86. (Doc. 22-1, p. 52). Plaintiff testified at the March 12, 2015 hearing that he fell because his blood pressure was high because it was unregulated. (Doc. 46, p. 17-19). Plaintiff told the staff to bring him some water and

stated that he would rather go to segregation than 4 House. (Doc. 22-1, p. 55). It appears that the doctor examined Plaintiff on that date as well. (Doc. 22-1, p. 55).

On September 30, 2014, Plaintiff refused to submit to lab work. (Doc. 22-1, p. 38, 55). Plaintiff saw the doctor in segregation again on October 14, 2014, and he re-ordered the labs. (Doc. 22-1, p. 56). The labs were ultimately collected on October 15, 2014. (Doc. 22-1, p. 56).

Plaintiff saw the nurse on November 5, 2014, complaining of back pain. (Doc. 22-1, p. 57). His blood pressure was listed as 108/84. (Doc. 22-1, p. 57). The nurse gave him acetaminophen and a hot and cold compress. (Doc. 22-1, p. 57). Plaintiff complained of pain again to the nurse on November 7, 2014, and requested a closer housing unit, an air mattress, and books. (Doc. 22-2, p. 1). The nurse referred Plaintiff to the doctor and gave him more acetaminophen. (Doc. 22-2, p. 1). His blood pressure was 112/82. (Doc. 22-1, p. 1).

On December 8, 2014, Plaintiff had an appointment with the doctor for his complaints of pain. (Doc. 97, p. 15). The doctor noted on that date that Plaintiff's x-ray had been negative for a wrist facture. (Doc. 97, p. 15). In Plaintiff's companion case, he submitted a radiology report indicating that his left wrist showed osteoarthritic changes but no signs of facture or dislocation. (Case. No. 15-87, Doc. 12-4, p. 30).

Plaintiff testified at the March 12, 2015 hearing that he had received his blood pressure medication approximately 3 days before the hearing, but before that he had been deprived of it for approximately 2 to 3 months. (Doc. 46, p.8-9). He believes that he got a thirty day supply in November or December. (Doc. 46, p. 9). He also testified that his blood pressure had been checked on March 9, 2015, but that it had not been checked in 3 to 4 months, despite his frequent requests. (Doc. 46, p. 10). Plaintiff testified that at the time he had filed his lawsuit, he had not received blood pressure medication for one to two months, but then after he filed the suit, he received a one month supply. (Doc. 46, p. 12).

6

Plaintiff also testified that he had suffered from gout, which caused him pain. (Doc. 46, p. 22). He also alleged that he had knots in in his wrist, back, and neck. (Doc. 46, p. 25-26). Plaintiff alleged that he had not received pain medication for either of these conditions. (Doc. 46, p. 22, 26) Plaintiff also alleged that he needed to use an ADA shower chair, and that the guards frequently denied him use of the chair. (Doc. 46, p. 22-24). Plaintiff also expressed dissatisfaction with his glasses and dentures. (Doc. 46, p. 26-28).

## Analysis

Prisoners seeking to proceed IFP after having "struck out" may only proceed if they are in imminent danger. **28 U.S.C. § 1915(g)**. The threat or prison condition causing the imminent danger must be real and proximate. **Lewis v. Sullivan, 279 F.3d 526, 529 (7th Cir. 2002)**. It also must be imminent or occurring at the time the complaint is filed; the rule is meant to address genuine emergencies where time is pressing. **Heirmermann v. Litscher, 337 F.3d 781, 782 (7th Cir. 2003) (citing Lewis, 279 F.3d at 531)**. The Court may also deny IFP status where the allegations are conclusory or ridiculous. **Ciarpaglini v. Saini, 352 F.3d 328, 331 (7th Cir. 2003)**.

While an IFP determination is not the proper vehicle to evaluate the seriousness of the allegations or the merits of the underlying suit, a defendant may challenge the plaintiff's claims of imminent danger. **Taylor v. Watkins, 623 F.3d 483, 485 (7th Cir. 2010)**. A hearing is an appropriate means of resolving a conflict between the parties regarding whether a prisoner was in imminent danger at the time of filing suit. **Id**.

In the Complaint, Plaintiff alleged that he was denied medical care on his left wrist, which he claims had nerve damage, from an assault by Officer Miller that allegedly took place on August 2, 2014. (Doc. 1, p. 4). Plaintiff also alleged that he was being denied medication for his high blood pressure, gout, asthma, and pain. (Doc. 1, p. 4). Plaintiff he alleged that he had been without

medication for two weeks. (Doc. 1, p. 7). Health care providers within the IDOC consider an inmate's blood pressure "in control" when it is less than 140/90.

The undersigned finds that Plaintiff is not credible on his claims that he was in imminent danger of serious harm at the time he filed the Complaint. First, in regards to his blood pressure, Plaintiff testified on March 12, 2015 that he had not gotten blood pressure medication for one to two months at the time he filed the Complaint on October 28, 2014, but plead in the Complaint that it had only been two weeks. The fact that Plaintiff made a large change to his story suggests that he is not credible.

Additionally, contrary to Plaintiff's testimony, there is evidence that the medical staff was constantly monitoring Plaintiff's blood pressure. The medical records submitted by Plaintiff show that Dr. Shah prescribed him Norvasc, a blood pressure medication, in July of 2014. Plaintiff's blood pressure was taken at least six times between July 2014 and the time he filed the Complaint, and each time it was within normal tolerance, or below. In his Complaint, Plaintiff specifically pointed to September 29, 2014 as a day when he got dizzy[1] and fell due to lack of blood pressure medication. He also alleged that the medical administrator ordered him removed from health care without any test being done. However, medical records submitted by Plaintiff show that Plaintiff's blood pressure was taken at that time and found to be 126/86, or within normal limits, thus contradicting Plaintiff's claims that he was suffering symptoms from high blood pressure and that the medical staff refused to treat him. Finally, Plaintiff's blood pressure was taken twice within 10 days of filing the Complaint and was normal both times. It was at 108/84 as measured by the health care staff on November 5, 2014, a mere seven days after he filed the Complaint. Two days later it was as 112/82. Simply put, there is ample evidence that Plaintiff is lying when he states that he was

---

[1] The Seventh Circuit has previously noted that lightheadness or dizziness is a symptom of low, not high, blood pressure. **See *Jackson v. Pollion*, 733 F.3d 786, 788 (7th Cir. 2013)**.

denied blood pressure medication. The undersigned finds Plaintiff's claims that he had not received his blood pressure medication prior to filing the Complaint not credible.

Plaintiff also alleges that he was denied medical care for a broken wrist that occurred when Officer Miller handcuffed him in front on August 2, 2014 and dragged him. (Doc. 1, p. 1). Although Plaintiff has claimed across multiple pleadings that his wrist was broken on August 2, 2014, the medical records contradict this assertion. First, there is no record of Plaintiff seeking medical attention on August 2, 2014, despite his familiarity with the medical procedures. Plaintiff also failed to report the injury around the time he claims that it happened. Plaintiff also initially refused sick call three days later on August 5, 2014, and then later changed his mind. When he was seen, he did not complain about wrist pain at all, but rather drew medical staff's attention to a small bump on his little toe. If Plaintiff had truly broken his wrist, he likely would have been in excruciating pain. But Plaintiff asks the Court to believe that a bump on his baby toe was a greater medical emergency. In fact, Plaintiff did not report wrist pain to the medical unit until September 2, 2014, nearly a full month after the alleged incident. On September 19, 2014, Plaintiff reported that "this situation," i.e. his wrist, had been happening for a month, which would put the date of injury closer to August 20, 2014, not August 2. None of the medical records document any objective record of any symptom other than pain—no bruises, contusions, or other indications of trauma were noted. In fact, medical records submitted by Plaintiff confirm an x-ray showed no signs that Plaintiff's wrist was ever broken.

Plaintiff's other complaints include that he was denied pain medication and his asthma inhaler. However, the medical records indicate that Plaintiff was frequently given acetaminophen in response to his complaints of pain. This may have not been the medication that Plaintiff wanted—the records indicate that he continually requested Naprosyn in lieu of Tylenol, but Plaintiff's claim that he was denied pain medication altogether is untrue. Plaintiff received acetaminophen at least

three times from the nurse between August 5, 2014 and the time he filed this Complaint. The undersigned finds that Plaintiff's allegations that pain medication had been withheld prior to the filing of the Complaint to be meritless.

Finally, although the Complaint alleges that Plaintiff was denied an asthma inhaler, the medical records show that Plaintiff was issued medication for his asthma during his intake interview at Pickneyville. The medical records do not document any complaints regarding Plaintiff's asthma. There are no records of any asthma attacks or breathing complaints. Plaintiff did not complain that he did not have an inhaler to medical staff. Plaintiff did not present any testimony at the March 2015 hearing regarding his asthma medication or allege that it had been withheld. Due to the lack of testimony and evidence in the record on this point, the undersigned finds that the allegations in Plaintiff's Complaint are not credible.

Having reviewed the evidence submitted by both sides, the undersigned finds that Plaintiff's allegations that he was in imminent danger of serious harm at the time he filed the Complaint to be not credible. The main thrust of Plaintiff's Complaint his parole was denied. Even though that claim was dismissed on threshold review because the Court found that the parole claim did not state that Plaintiff was in imminent danger of harm, Plaintiff has continued to file numerous motions and pleadings regarding his parole, all of which have been denied. This suggests that the real purpose in this case is to provide leverage for Plaintiff in his quest to be released from prison. The fact that Plaintiff frequently attempts to bring the Court's attention to claims that were previously dismissed shows that Plaintiff's claims of deliberate indifference to serious medical needs are not his number one priority. And the evidence in the record suggests strongly that those claims are merely Plaintiff's inventions, possibly included for no other purpose than to defeat the three-strikes bar. The medical records do not support Plaintiff's claims that staff was deliberately indifferent. Specifically, they do not support Plaintiff's claims that medication was withheld from him in the weeks prior to the

complaint. Nor do they support Plaintiff's claim that he suffered a broken wrist. Plaintiff's own testimony regarding these issues is inconsistent with his pleadings and the records that he himself submitted in support of his case.

For these reasons, the undersigned **RECOMMENDS** that the District Judge **GRANT** Defendants' Motion to Revoke Plaintiff's IFP status, and impose the full filing fee on Plaintiff. Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties may object to any or all of the proposed dispositive findings in this Recommendation. The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. **See, e.g., Snyder v. Nolen, 380 F.3d 279, 284 (7th Cir. 2004).** **<u>Objections to this Report and Recommendation must be filed on or before November 16, 2015</u>.** **See** Fed. R. Civ. P. 6(d); SDIL-LR 5.1(c).

IT IS SO RECOMMENDED.

DATE: <u>October 28, 2015</u>                                              /s/ *Stephen C. Williams*
                                                                                            STEPHEN C. WILLIAMS
                                                                                            United States District Judge